**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

ANDREW STRANBERG, an individual,

        Plaintiff,

v.

ALI ALATIEH JASSIM, an individual,

        Defendant.

_____ /

CASE NO.:

## **COMPLAINT**

Plaintiff Andrew Stranberg ("Plaintiff"), by and through the undersigned counsel of record, hereby sues Defendant Ali Alatieh Jassim ("Defendant"), and, for his Complaint, Plaintiff states as follows:

### **INTRODUCTION**

1. The facts underlying this case are egregious.

2. Defendant, a mainland transplant who relocated to Puerto Rico under the so-called "Act 22" tax-haven program, is far more than a well-connected investor; he claims to be a major financial power broker in Middle East circles. He is publicly known as a former adviser to Sheikh Mansour bin Zayed Al Nahyan of Abu Dhabi, and someone who carries substantial offshore financial interests (including roles with Malta-incorporated entities such as Goldbrook Holdings Limited), and a man who lives the trappings of extreme wealth—luxury homes, grand real estate purchases (including a $50 million home in Dorado Beach and $20 million mansion in Miami Beach), yachts, and an opulent lifestyle.

3. These are not idle bragging points. They are part of the image and credibility that Defendant presents to the world, and these points are what led Plaintiff—and potentially others—

1

to invest significant sums based on the belief that Defendant is a stable, transparent, and honest partner. The problem is that, behind that luxurious façade, the narrative was riddled with lies. Defendant used his reputation, connections, and offshore vehicles as shield and spectacle—to promise returns on investments over which he had no control or certainty, to misrepresent who owned or controlled assets, and to conceal material facts that Plaintiff reasonably relied upon for his own financial decisions.

4.    Thus, while Defendant's public persona is one of wealth, influence, and high stakes dealmaking, this Complaint shows that Defendant used that persona as the vehicle for fraud, deceptive inducements, and misappropriation for his own benefit. Plaintiff is not merely seeking redress for broken promises; Plaintiff seeks accountability for false pretenses, misrepresentation, and betrayal of trust.

5.    Defendant is not, and has never been, a registered broker-dealer, investment advisor, or licensed investment professional of any kind. Nevertheless, he held himself out as a sophisticated dealmaker and targeted unsuspecting individuals to invest in a company with which Defendant (mis)represented that he had no formal role or fiduciary responsibility—no officer position, no director title, no real authority—solely so that Defendant could secretly profit through transaction-based compensation.

6.    In reality, Defendant operated under a pay-to-play scheme: the more investor money that Defendant funneled into the company, the more that Defendant was personally paid—whether in cash, stock, or other consideration. Motivated by self-interest rather than investor protection, Defendant solicited Plaintiff's funds aggressively, "raising capital" by any means necessary, with no concern for truth, transparency, risk, or the law.

7.      To induce Plaintiff's investments, Defendant fabricated or grossly inflated his own supposed capital contributions, representing that he had already invested substantial sums in the company and urging Plaintiff to "match his investment."  In truth, the investments Defendant claimed to have made either did not exist at all or were dramatically smaller than represented.

8.      Relying on Defendant's false assurances, Plaintiff invested millions of dollars believing that Plaintiff was aligning with Defendant's own financial commitment and relying on Defendant's claimed knowledge of the company's strength and viability.  In reality, Defendant had no genuine investment knowledge, no meaningful involvement with the company, and no basis for the representations that Defendant made to Plaintiff.  Indeed, as noted below, Defendant later balked at the notion of requesting bank statements from someone at the company he purported to represent.

9.      In addition, Defendant concealed his own lack of due diligence.  Defendant presented the investments as sure thing, vetted opportunities when, in fact, Defendant had no knowledge about the company's operations, financial condition, or prospects.  As it pertains to his relationship with Plaintiff, Defendant's sole focus was securing Plaintiff's funds so that Defendant could collect his undisclosed compensation.

10.     Defendant's actions were intentional, calculated, and designed to deceive. Defendant leveraged his purported connections, financial sophistication, and fabricated investment commitments to induce Plaintiff to part with his money, while secretly ensuring that Defendant personally profited regardless of whether Plaintiff ever saw a return.

11.     As a direct and proximate result of Defendant's misrepresentations and omissions, Plaintiff has suffered millions of dollars in losses, while Defendant pocketed undisclosed compensation and continues to profit at Plaintiff's expense.

## PARTIES, JURISDICTION, AND VENUE

12.     This is an action for damages of more than seventy-five thousand dollars ($75,000.00), exclusive of interest and attorneys' fees and costs.

13.     Plaintiff Andrew Stranberg is a natural person currently residing in Spain and is otherwise *sui juris*.

14.     Defendant Ali Alatieh Jassim is a natural person who, upon information and belief, is a resident of Puerto Rico under the "Act 22" tax incentive program (now part of Act 60), which has drawn national scrutiny for attracting ultra-wealthy individuals seeking to avoid federal income taxes.  Notably, Defendant resides in Dorado Beach, Puerto Rico, where he  operates from a $50 million luxury residence that serves as the base of operations for the fraudulent scheme described herein.  From this property, Defendant has hosted potential investors, including Plaintiff, flaunted his purported wealth and connections, and used the appearance of opulence and legitimacy to induce Plaintiff and upon information and belief others to invest millions of dollars under false pretenses.   Defendant is otherwise *sui juris*.

15.     Defendant is subject to the personal jurisdiction of this Court because he resides in this judicial district and because the acts and omissions giving rise to this lawsuit occurred, at least in substantial part, within this judicial district.

16.     Venue is proper in this Court pursuant to 28 U.S.C. Section 1391 because Defendant resides in this district, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

17.     In connection with the conduct alleged in this Complaint, Defendant, directly and indirectly, individually and in concert with others, made use of the means and instrumentalities of

interstate commerce, the facilities of interstate transportation and communication, and/or the mails, which gives rise to jurisdiction under 15 U.S.C. Section 78o(a)(1).

18.     All conditions precedent to bringing this action have been performed, have occurred, or have been waived or excused by Defendant.

## GENERAL ALLEGATIONS

### A.  Defendant and His Credentials.

19.     Defendant portrays himself as a high-end global investor and advisor with relationships bridging the Middle East, Europe, Asia, and the United States.  Defendant is reported in multiple press outlets to have once served as a financial advisor to Sheikh Mansour bin Zayed Al Nahyan of Abu Dhabi.  In an article published by *Financial Times* and others, Defendant is described as having been "an adviser to the sheikh," praised for being "well-connected in the Middle East," and commended for his ability to "think outside the box."

20.     Sheikh Mansour bin Zayed Al Nahyan is not a minor figure.  He is the Deputy Prime Minister of the United Arab Emirates, a member of the Abu Dhabi royal family, and the brother of the current UAE President, Sheikh Mohamed bin Zayed Al Nahyan.  Sheikh Mansour is widely known as one of the wealthiest and most influential individuals in the Middle East, controlling vast holdings through the Abu Dhabi United Group, including the Manchester City Football Club, and with investments spanning global finance, real estate, energy, and infrastructure. Public records and press reports value his family's assets in the hundreds of billions of dollars, much of it managed through sovereign wealth funds such as Mubadala Investment Company and the Abu Dhabi Investment Authority, two of the largest sovereign wealth funds in the world.

21.     Other reporting indicates that Defendant has been involved in high-profile dealmaking circles, particularly in connection with Amanda Staveley's work on significant Gulf investments (such as the Barclays investment by Sheikh Mansour) and has been identified as a "close associate" or "broker" in transactions tied to large sovereign or quasi-sovereign entities.

22.     Defendant aggressively promotes himself as a "global investor" and self-proclaimed power broker who, according to his own statements, has "played a key role in major landmark financial transactions" and serves as "the owner and principal of an international consulting firm advising on investments across Asia, the Middle East, Europe, and the United States."   Through interviews, press statements, and promotional materials, Defendant has deliberately crafted the image of a high-level financial strategist with exclusive access to capital, sovereign wealth, and elite investment opportunities—an image that Defendant leveraged in soliciting millions of dollars from investors, including Plaintiff.

23.     Defendant has also leveraged offshore entities and public record listings (as seen in the ICIJ Offshore Leaks/Paradise Papers databases) to establish a persona of financial sophistication and cross-border investment authority.   These offshore links and his public statements have been part of the evidence by which prospective investors—including Plaintiff—were persuaded of his legitimacy and credibility.

24.     Defendant used the image of wealth, influence, and Middle East connections—as well as his public advisory claims—to secure trust and confidence from investors, including Plaintiff, representing that Defendant had actual ownership, capital contributions, or decision-making involvement in investment opportunities in which he had none, all for Defendant's personal profit.

25.    Yet despite this carefully cultivated image of international financial influence, Defendant has no licenses, registrations, or regulatory authorizations to act as a broker-dealer, investment adviser, or any other regulated investment professional.  Defendant is not registered with the SEC, FINRA, or any other securities authority.

**B. Defendant Induces Plaintiff to Invest in the Company That Defendant Suggests.**

26.    Plaintiff first met Defendant in 2018.  What began as what Plaintiff believed to be a legitimate business relationship gradually evolved into what Plaintiff thought was a true friendship.  In reality, Defendant viewed Plaintiff not as a friend, but as a financial target.

27.    By March 2022, Defendant exploited that relationship to begin aggressively pitching Plaintiff on investing in Blockchain Consulting Group, LLC ("BCCG").  Defendant repeatedly presented these investments as lucrative, high-upside opportunities, representing that they were backed by substantial financial resources, cutting-edge technology, and imminent returns.

28.     Defendant assured Plaintiff that   BCCG was a credible investment opportunity.

29.    In truth, Defendant had no actual knowledge of BCCG's financials, operations, or performance, nor did Defendant conduct any independent due diligence.  Yet, Defendant misrepresented both the financial strength and the underlying technology of BCCG in order to create the illusion of security and profit potential.

30.    Defendant also made specific representations about the viability and value of the technology underpinning BCCG, when in actuality, Defendant had no knowledge or expertise in this area.

31.    Defendant likewise misrepresented his own role, implying inside knowledge and involvement when, in fact, Defendant had no officer title, no operational position, and no material

information about BCCG's viability. Defendant's only interest was generating as much investment as possible to trigger his own cash or stock compensation. Simply stated, unbeknownst to Plaintiff, Defendant did not work for or have any material knowledge of the performance, financials, viability, or operations of BCCG. Yet, Defendant's relationship with BCCG allowed him to receive the unauthorized kickbacks discussed herein.

32.    Defendant relentlessly pursued Plaintiff's participation in BCCG, repeatedly telling Plaintiff how strongly that Defendant believed in the investment. For example, on March 22, 2022, Defendant assured Plaintiff that Defendant "feel[s] good about [the BCCG investment]."

33.    Over the following months, Defendant continued pressuring Plaintiff to invest more money at every opportunity. He repeatedly contacted Plaintiff—including on March 25, June 13, June 17, June 20, June 22, June 29, and June 30, 2022—pushing to "wrap up the [BCCG] deal" and finalize Plaintiff's commitments.

34.    Defendant's communications grew increasingly aggressive as he pushed Plaintiff to increase Plaintiff's stake. For example, on August 16, 2022, Defendant wrote: "If you can squeeze an extra .25% then it would be amazing . . . Even 0.125% at least . . . There's an approximate $147m initial payout end of September . . . If you can get over 1.5% of the company, then it's meaningful."

35.    The very next day, Defendant texted: "Are you trying to pick up an extra 0.5% for $150k? Lol."

36.    Throughout this campaign, Defendant assured Plaintiff that their interests were aligned, making statements such as:

   i.    "I feel like we are going to make lotsa money together and have even more fun doing it" (March 25, 2022);

ii.    "I think we are going to hit it out of the park. As crazy as it may sound" (June 10, 2022);

iii.    "I'm going in big into this. This thing can be a 100x plus play" (August 16, 2022);

iv.    "We are in this together! And we will prevail" (August 18, 2022); and

v.    "This could be the biggest multiple return on any investment we have done in our lives" (October 17, 2022).

37.    In reality, Defendant was not "in this together" with Plaintiff at all.  Defendant's sole purpose was to inflate the amount of investor capital raised so that Defendant could personally collect transaction-based compensation for himself.

38.    During this time, the parties also had numerous in-person and phone conversations wherein Defendant attempted to convince Plaintiff to invest more into BCCG.

39.    These statements were only made to induce Plaintiff into investing so that Defendant could enrich himself.

40.    All in all, as a direct result of Defendant's representations, Plaintiff invested $1,631,600.00 into BCCG.[1]

**C. Defendant Misrepresents to Plaintiff that Defendant is Investing Millions in BCCG.**

41.    At every stage of the investment solicitations, Defendant repeatedly represented to Plaintiff that Defendant was personally investing as much as—or even more than—Plaintiff. Defendant urged Plaintiff to "match" Defendant's supposed investments, creating the illusion that they were financial partners with aligned interests.  In reality, Defendant was inflating or fabricating his own investment amounts so that Plaintiff, believing that Defendant was matching

---

[1] Investments in BCCG were made through Hollywood Productions LLC.

Plaintiff dollar-for-dollar, was in fact investing far more capital, receiving less equity, while Defendant secretly obtained bonus stock and undisclosed payments for every dollar that he induced Plaintiff to contribute.

42. Defendant represented to Plaintiff that Defendant had personally invested no less than $3,000,000.00 into BCCG.

43. These figures, as Plaintiff has since learned, were grossly inflated—or outright false—fabricated solely to pressure Plaintiff into committing even more capital.

44. Defendant made these misrepresentations for a simple reason: to make the investments appear more attractive and trustworthy by suggesting that Defendant had personally "put skin in the game," thereby convincing Plaintiff to invest heavily. In truth, Defendant's motive was self-serving—Defendant was receiving undisclosed kickbacks, bonus equity, and transaction-based compensation for every dollar that Plaintiff invested.

**D. Based on Defendant's Representations, Plaintiff Invests.**

45. Plaintiff has since discovered that the amounts Defendant claimed to have personally invested in BCCG were grossly exaggerated—or outright fabricated—and were deliberately manufactured to mislead Plaintiff into committing even more capital based on the false belief that Defendant had personally invested significant sums and had aligned financial interests.

46. In reality, despite repeatedly claiming that he had invested "over $3,000,000" into BCCG, Defendant's actual out-of-pocket investment totaled only $1,306,500.00, consisting of the following:

      i.      $50,000.00 on March 18, 2022

      ii.     $756,500.00 on March 24, 2022

iii.       $50,000.00 on April 15, 2022

iv.       $450,000.00 on April 20, 2022

47.    Even that figure is misleading, however.  In reality, Defendant improperly took credit for a $403,500.00 investment made by Plaintiff, reducing Defendant's actual personal investment to only $903,000.00, less than one-third of what Defendant represented to Plaintiff and others.

48.    And, Plaintiff only invested that $403,500.00 figure based on Defendant's following representation:

> FYI, I am sending $806,500 for the initial part now for half the position. And the rest for the remaining position within 30 days. So you can send $403,250 now or the full $500,000. Up to you. Either way you have the 50x waterfall as agreed on the amount. Want full transparency buddy

Consistent with the actions addressed herein, however, Defendant never made payment "for the remaining position"—not within thirty days, *not ever*.

49.    Plaintiff, by contrast, invested in BCCG heavily and in reliance on Defendant's repeated false representations—$1,631,600.00 in total—as follows:

i.       $403,500.00 on March 24, 2022

ii.       $602,600.00 on June 30, 2022

iii.       $625,500.00 on August 22, 2022

50.    In other words, Plaintiff and Defendant entered into an oral investment contract whereby Plaintiff agreed to contribute capital to BCCG, and Defendant agreed that, in exchange for Plaintiff's investment, Plaintiff would receive (a) documented ownership rights in BCCG, (b) regular financial reporting, and (c) a return on his investment consistent with the representations Defendant made prior to and following Plaintiff's funding.

11

51.    As noted herein, Defendant repeatedly acknowledged the existence of this agreement through ongoing communications, including assurances concerning Plaintiff's ownership interests, promised returns, and representations that the contractual obligations would be fully documented once internal processes were completed.

52.    However, it was all a lie.  Because the material obligations that gave the contract its purpose were never performed.  Plaintiff never received the required ownership documentation, never received the promised financial information, and never received any of the returns that Defendant represented he would earn.

53.    Instead of performing these obligations, Defendant provided only shifting explanations, delayed updates, and repeated false assurances that documentation was forthcoming and that returns were imminent.

54.    BCCG has now collapsed.  As a result, Plaintiff's investments—made entirely in reliance on Defendant's misrepresentations—are now rendered worthless.

55.    To date, Plaintiff has not received a single dollar of return on any of his investments in BCCG.  Plaintiff's capital has been completely lost, while Defendant, who fabricated his own financial stake and concealed his personal profit motives, enriched himself at Plaintiff's expense.

56.    Plaintiff invested this capital solely because of Defendant's representations and false promises.  Had Plaintiff known the truth—that Defendant had exaggerated or fabricated his own investments, taken credit for Plaintiff's money, Plaintiff would not have invested a single dollar in BCCG.

**E.  Defendant Continues to give False Assurances Despite Plaintiff's Concerns.**

57.    On May 23, 2022, after receiving no documentation, updates, or returns on his investments, Plaintiff began expressing serious concerns to Defendant.  Rather than disclose the

12

truth, Defendant—knowing that Defendant needed Plaintiff's capital for his own gain—offered false reassurances to keep Plaintiff's money in play:

Plaintiff: Are we getting porked?

Defendant: Says on track. I've seen the correspondence and updates.

--

Defendant: Should know in the next couple of weeks. 2/3 weeks

58.     Around this same period, Defendant repeatedly sent false, upbeat messages to lull Plaintiff into inaction, including: "Great news coming on all fronts amigo" (June 6, 2022), "I think it's a gonna happen honestly" (June 6, 2022), and "I think we are going to hit it out of the park. As crazy as it may sound" (June 10, 2022).

59.     When Plaintiff still had not received any formal paperwork by July 29, 2022, Defendant continued delaying and deflecting, texting: "They're apparently finishing out all the shareholding and hopefully we get final version of operating agreement soon." These stall tactics went on for months.

60.     Between September 26–29, 2022, as Plaintiff's suspicions grew after still receiving no payments, Defendant again downplayed Plaintiff's concerns and told him to wait longer:

Plaintiff: Do you think we should request las[t] three bank statements from Hollywood Productions? Any idea when we are supposed to get our first payment?

--

Defendant: We can't ask for bank statements of a company. I would never divulge that. Leave that part.

--

Plaintiff: I am just interested where this first payment is actually coming from?

--

Defendant: Let's wait til next week, and then we can press.

--

Plaintiff: It worries me he still has not closed.

--

13

Defendant: At least we know we would get our money back if shit hit the fan, but it won't. next week is tale telling.  All things indicating towards a successful transaction. Fingers crossed

61.    The fact that Defendant refused to request financial information from a company for which Defendant was soliciting investments is telling.

62.    On September 29, 2022, when Plaintiff said that he was considering asking for his money back, Defendant again convinced Plaintiff to wait, falsely stating: "Really?  Why?  We are one or two weeks away from knowing."

63.    These repeated assurances were materially false and designed solely to prevent Plaintiff from pulling his money out or uncovering the truth.

64.    Throughout this entire period, Defendant consistently misrepresented the status of the investments, concealed material facts, and told Plaintiff to "sit tight" while knowing—or recklessly disregarding—that the investments were failing and that Plaintiff's money was at risk.

65.    In fact, as recently as May 30, 2024, Defendant continued to placate Plaintiff's growing concern, stating as follows: "Let's wait it out a bit. We have time[.]"

66.    Importantly, at all times material, while a reasonable investor may have been alerted to the possibility of fraud on the part of BCCG, a reasonable investor would not have been alerted to the possibility of *fraud on the part of Defendant*.

67.    In reality, Plaintiff did not and could not have discovered the fraudulent nature of Defendant's conduct through the exercise of due diligence until January 23, 2024, when Plaintiff first obtained information contradicting Defendant's prior representations (including, but not limited to, the fact that Defendant was gaining additional stock for less investments).  Up until January 23, 2024, Plaintiff believed that Defendant had in fact invested the funds he had

14

represented, which turned out to be false, and confirmed on January 23, 2024, by way of the aforementioned information conveyed in an attachment to an electronic message.

68.    Notably, on that date, for the first time, Defendant confirmed through his personal counsel that Defendant had misrepresented the amount of his investments to Plaintiff:

> **From:** gaurav krishan <gkrishan@goldbrook.holdings>
> **Sent:** Tuesday, January 23, 2024 12:12 AM
> **To:** Aaron Resnick, Esq <aresnick@thefirmmiami.com>
> **Cc:** 'Ali Jassim' <ajassim@goldbrookadvisory.com>; Andrew Stranberg <stran1@me.com>
> **Subject:** Ali Wire Confirmations - Hollywood Productions, LLC
>
> Hi Aaron – Please find attached the wire confirmations for Ali's payments to Hollywood Productions. Please let us know if you need anything else.
>
> Thanks,
>
> Gaurav
>
> **Gaurav Krishan**
> **direct** 510.299.2139
> **email** gkrishan@goldbrook.holdings
> 9663 Santa Monica Blvd, Suite 699
> Beverly Hills, CA 90210

69.    In other words, although Plaintiff raised concerns in 2022 regarding BCCG's delays, those concerns related solely to the company's performance. Plaintiff had no reason to suspect that Defendant himself had engaged in fraud. It was not until January 23, 2024—when Plaintiff first received wire confirmations directly contradicting Defendant's representations about the amount of his own investments—that Plaintiff *actually* discovered Defendant's fabricated investment amounts, concealed kickbacks, and self-dealing. These facts were uniquely within Defendant's knowledge and could not have been discovered earlier through reasonable diligence.

70.    Defendant's ongoing misrepresentations and concealment of material facts prevented Plaintiff from (1) timely discovering the fraud and (2) recalling Plaintiff's investments

15

before it was too late.  Simply stated, each of Defendant's reaffirmations, misrepresentations, and omissions through (at least) 2024 perpetuated the original fraud and inflicted new and continuing injury upon Plaintiff.

**F. The More Money Defendant Raised, the More Money and Stock Defendant Received—and Defendant did so Without Regard to the Truth.**

71.     Defendant repeatedly downplayed Plaintiff's concerns because every time that Plaintiff invested additional capital, Defendant personally benefited.

72.     Specifically, Defendant received undisclosed incentives—including cash, stock, and other preferred benefits—directly tied to the amount of money that Plaintiff (and, potentially, others) invested in BCCG.  Defendant did not disclose these compensation arrangements to Plaintiff at the time of solicitation.

73.     A prime example is Plaintiff's March 24, 2022, investment of $403,500.00 into BCCG—an investment for which Defendant improperly took credit, thereby increasing Defendant's own compensation and equity stake while diluting Plaintiff's ownership percentage.

74.     As a result, even though Plaintiff invested a total of $1,631,600.00 and Defendant personally invested only $903,000.00, Defendant now holds 4% of BCCG's stock while Plaintiff holds only 2%—a disparity that directly resulted from Defendant's misrepresentations and self-dealing.  A true and correct copy of the BCCG Operating Agreement is attached hereto as **Exhibit 2** (at Exhibit C therein).

75.     These facts not only demonstrate Defendant's misrepresentations and self-enrichment, but also his violation of federal securities law.  Under the Securities Exchange Act of 1934, anyone who receives compensation contingent upon the successful sale of securities—or tied to the amount of capital raised—must be registered as a broker-dealer.  Defendant is not a registered broker-dealer, making his conduct unlawful as well as fraudulent.

76. Further evidencing his fraudulent intentions, on at least one occasion, Defendant instructed Plaintiff to delete certain messages between them.

77. In sum, Defendant used every tool at his disposal—his cultivated reputation as a "global investor," his purported ties to Middle Eastern royalty and sovereign wealth, his lavish lifestyle, and his repeated assurances of personal financial commitment—to solicit millions of dollars from Plaintiff through material misrepresentations and omissions.

78. Defendant fabricated or grossly inflated his own supposed investments, concealed his self-enrichment through undisclosed kickbacks, bonus equity, and transaction-based compensation, and repeatedly misrepresented the financial condition, viability, and prospects of BCCG while refusing to provide meaningful documentation or transparency.

79. Even as Plaintiff raised concerns, Defendant doubled down with false promises, delay tactics, and fraudulent reassurances to prevent Plaintiff from withdrawing his capital or uncovering the truth, all while Defendant personally profited from every additional dollar that Plaintiff invested in BCCG.

80. The result is that Plaintiff invested $1,631,500.00, while Defendant invested only a fraction of what Defendant claimed, took credit for Plaintiff's own contributions, enriched himself with undisclosed compensation, and left Plaintiff with worthless investments in failed entities.

81. Defendant's actions—including making material misrepresentations to obtain investments for his own benefit, concealing his compensation arrangements, and failing to register as a broker-dealer despite receiving transaction-based compensation—violate federal securities laws and give rise to Plaintiff's claims for damages under federal and state law.

17

82.    As a direct and proximate result of Defendant's misconduct, Plaintiff has suffered substantial damages, including the full amount of his lost investments, and is entitled to recover all available relief.

## COUNT I
## VIOLATION OF § 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 10b-5

83.    Plaintiff reaffirms, realleges, and reincorporates paragraphs 1 through 82 as if fully set forth herein.

84.    This cause of action arises under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Section 78j(b), and Rule 10b-5, 17 C.F.R. Section 240.10b-5, promulgated thereunder.

85.    Between March and October 2022, Defendant, directly and indirectly, in connection with the purchase or sale of securities, made materially false statements and omissions of material fact, which Defendant knew, or recklessly disregarded, were misleading to the extent that the statements and omissions misrepresented or omitted material facts necessary to render the statements not misleading under the circumstances in which they were made.

86.    In connection with the conduct alleged in this Complaint, Defendant, directly and indirectly, individually and in concert with others, made use of the means and instrumentalities of interstate commerce, the facilities of interstate transportation and communication, and/or the mails, which gives rise to jurisdiction under 15 U.S.C. Section 78o(a)(1).

87.    Defendant acted with scienter in that his misrepresentations and omissions were made knowingly, willfully, and with the intent to deceive Plaintiff for Defendant's personal gain. Defendant's scheme depended on fabricating his own supposed financial commitments,

18

concealing his lack of authority or role within BCCG, and mischaracterizing the safety and viability of the investments in order to induce Plaintiff's reliance.

88.    Alternatively, and at a minimum, Defendant acted with severe recklessness in making such material misstatements and omissions.  Defendant was aware, or recklessly disregarded, that his representations about his own investments, his purported role in BCCG, and the security of the investment opportunities were false or misleading.  Defendant further knew, or was reckless in failing to know, that he had a direct and undisclosed financial interest in inducing Plaintiff's investments through transaction-based compensation.

89.    The particularized facts alleged herein, including Defendant's undisclosed pay-to-play compensation structure, fabricated self-investments, lack of due diligence, and concealment of his lack of authority, collectively give rise to a strong inference that Defendant acted with scienter.

90.    Defendant violated Section 10(b) of the Exchange Act and Rule 10b-5 in that he: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff's investments in BCCG.

91.    Plaintiff justifiably relied on Defendant's material misrepresentations and omissions in deciding to invest in BCCG.  Plaintiff had no reason to doubt Defendant's representations that he had personally invested substantial sums, that he possessed special

19

knowledge and connections regarding BCCG, and that the investment opportunities were safe and vetted.

92.    Defendant intentionally cultivated an appearance of sophistication, insider status, and financial commitment to induce Plaintiff's trust and reliance.  Because Defendant concealed his lack of authority, his undisclosed compensation structure, and his failure to conduct due diligence, Plaintiff was deprived of information necessary to evaluate the truth, risks, and conflicts of interest associated with the investments.

93.    Plaintiff's reliance on Defendant's false statements and omissions was reasonable and foreseeable under the circumstances and directly caused Plaintiff to part with millions of dollars that he would not otherwise have invested.

94.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiff suffered damages in connection with his investments in BCCG.  In reliance on Defendant's misstatements and omissions, Plaintiff committed $1,631,600.00 to BCCG.  Plaintiff would not have provided these funds if he had been aware of the misstatements and omissions made by Defendant.  Plaintiff did not know, and could not in the exercise of reasonable diligence have known, of Defendant's misrepresentations and omissions.  The same misrepresentations and omissions directly caused Plaintiff's losses.

95.    By virtue of the conduct alleged herein, Defendant has violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and is liable to Plaintiff for damages in an amount to be determined at trial, but no less than $1,631,600.00.

## COUNT II
## VIOLATION OF § 15 OF THE SECURITIES EXCHANGE ACT OF 1934

96.    Plaintiff reaffirms, realleges, and reincorporates paragraphs 1 through 95 as if fully set forth herein.

20

97.     This cause of action arises under Section 15(a) of the Securities Exchange Act of 1934, 15 U.S.C. Section 78o(a)(1), which makes it unlawful for any person to effect transactions in, or to induce or attempt to induce the purchase or sale of, any security unless such person is registered as a broker or dealer under the Act.

98.     At all relevant times, Defendant was not registered as a broker-dealer, investment adviser, or any other licensed securities professional under federal or state law, nor was he affiliated with any registered broker-dealer.

99.     Despite the foregoing, between March and October 2022, inclusive, Defendant made the various false and materially misleading statements specified above to induce Plaintiff into investing into BCCG.

100.    All in all, Defendant made use of the mails or the means or instrumentalities of interstate commerce effected transactions in, or induced or attempted to induce the purchase or sale of securities without being registered as a broker or dealer or associated with a registered broker or dealer.

101.    By reason of the foregoing Defendant violated Section 15(a)(1) of the Exchange Act, specifically 15 U.S.C. Section 78o(a)(1).

102.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered damages in an amount to be proven at trial, including but not limited to the full value of Plaintiff's lost investments, together with pre- and post-judgment interest and such other relief as this Court deems just and proper.

## COUNT III
## VIOLATION OF PUERTO RICO UNIFORM SECURITIES ACT
## 10 L.P.R.A. § 851

103.   Plaintiff reaffirms, realleges, and reincorporates paragraphs 1 through 102 as if fully set forth herein.

104.   Plaintiff's investments in BCCG (which were induced by Defendant) are "securities" within the meaning of the Laws of Puerto Rico Title Ten.

105.   Section 851 makes it unlawful for a person in connection with the offer or sale of any investment or security, directly or indirectly, "(1) To employ any device, scheme, or artifice to defraud; (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person; (4) to issue, circulate, or publish any material, printed or through electronic means, containing false representation of a material fact, or omitting information concerning a necessary material fact, so that the information which is issued, circulated or published, in the light of the circumstances in which it was issued, circulated or published, leads to an error, or (5) to issue, circulate, or publish any material, or make any written statement, unless the name of the person who issues, circulates or publishes or makes the aforesaid, and the fact that it is that person who issues, circulates, publishes or makes the statement, is clearly indicated in that same communication."

106.   Under Puerto Rico's Uniform Securities Act, it is also unlawful to knowingly and willfully falsify, conceal or cover up, by any trick, scheme, or device, a material fact, make any false, fictitious, or fraudulent statement or representation, or make or use any false writing or document, knowing the same to contain any false, fictitious, or fraudulent statement or entity.

22

107.    Between March and October 2022, inclusive, Defendant made the various false and materially misleading statements specified above, which he knew, or recklessly disregarded, were misleading to the extent they misrepresented or omitted material facts necessary to render the statements, in light of the circumstances under which they were made, not misleading.

108.    As alleged, Defendant violated the Puerto Rico's Uniform Securities Act by, among other things: (i) employing a device, scheme, or artifice to defraud Plaintiff; (ii) making untrue statements of material facts, both verbally and in writing, and omitting to state material facts and provide information that would render the statements misleading in light of the circumstances under which they are made; (iii) engaging in an act, practice, or course of business which operates or would operate as a fraud or deceit upon a person; and (iv) knowingly and willfully falsifying, concealing, or covering up, by any trick, scheme, or device, a material fact, making any false, fictitious, or fraudulent statement or representation, or making or using any false writing or document, knowing the same to contain any false, fictitious, or fraudulent statement.

109.    In reality, Defendant never had any intention of investing $3,000,000.00 in BCCG and only said he would in order to induce Plaintiff into investing and continuing to invest—all for Defendant's gain.

110.    Defendant's wrongful and malicious acts and conduct in misrepresenting his investments as a way to get Plaintiff to invest more were a direct violation of the Puerto Rico's Uniform Securities Act and were continuously and intentionally omitted and/or concealed from Plaintiff.

111.    But for Defendant's misrepresentations and omissions, Plaintiff would not have invested in BCCG.

23

112.    As a direct and proximate result of Defendant's actions as alleged herein, Plaintiff has suffered damages.

113.    Plaintiff is entitled to an award of attorneys' fees pursuant to 10 L.P.R.A. Section 890(a)(2).

**COUNT IV**
**VIOLATION OF PUERTO RICO UNIFORM SECURITIES ACT**
**10 L.P.R.A. §861(a)**

114.    Plaintiff reaffirms, realleges, and reincorporates paragraphs 1 through 113 as if fully set forth herein.

115.    This cause of action arises under Section 861(a) of Puerto Rico's Uniform Securities Act, which makes it unlawful for any person to effect transactions in, or to induce or attempt to induce the purchase or sale of, any security unless such person is registered as a broker-dealer.

116.    At all relevant times, Defendant was not registered as a broker-dealer, investment adviser, or any other licensed securities professional under federal or state law, nor was he affiliated with any registered broker-dealer.

117.    Despite the foregoing, between March and October 2022, inclusive, Defendant made the various false and materially misleading statements specified above to induce Plaintiff into investing into BCCG.

118.    By reason of the foregoing, Defendant violated Section 861(a).

119.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered damages in an amount to be proven at trial, including but not limited to the full value of Plaintiff's lost investments, together with pre- and post-judgment interest and such other relief as this Court deems just and proper.

24

120.    Plaintiff is entitled to an award of attorneys' fees pursuant to 10 L.P.R.A. Section 890(a)(2).

**COUNT V**
**DOLO IN FORMATION OF CONTRACT**

121.    Plaintiff reaffirms, realleges, and reincorporates paragraphs 1 through 120 as if fully set forth herein.

122.    Under Puerto Rico law, contractual *dolo* in the formation of a contract exists when a party is induced by false statements to execute a contract which he otherwise would not have made. To establish *dolo* in formation, a plaintiff must demonstrate: (1) a false representation by the defendant; (2) the plaintiff's reasonable and foreseeable reliance thereon; (3) injury to the plaintiff as a result of the reliance; and (4) an intent to defraud. P.R. Elec. Power Auth. v. Action Refund, 515 F.3d 57, 66 (1st Cir. 2008) (citing P.R. LAWS ANN. tit. 31, § 3408).

123.    Between March 2022 and October 2022, Defendant made repeated false representations to induce Plaintiff to enter into an investment contract and to invest substantial funds in BCCG. These representations were made through in-person meetings at Defendant's residence in Dorado Beach, Puerto Rico, through telephone conversations, and through electronic communications including text messages.

124.    Defendant's false representations included the following material misstatements:

a)   On or about August 16, 2022, Defendant represented to Plaintiff via text message that Defendant had personally invested "over $3m" in BCCG and stated "I'm going in big into this. This thing can be a 100x plus play." In reality, Defendant's actual out-of-pocket investment totaled only $903,000.00 – less than one-third of the represented amount. Defendant further inflated this figure by improperly taking credit for Plaintiff's own $403,500.00 investment made on March 24, 2022, investing it in Defendant's own name instead of Plaintiff's.

b)   Throughout the solicitation period, Defendant repeatedly urged Plaintiff to "match" Defendant's supposed investments, creating the false impression that Defendant and Plaintiff were financial partners with aligned interests. For

example, on March 24, 2022, Defendant represented that he was "sending $806,500 for the initial part now for half the position" and that Plaintiff should contribute accordingly to receive "the 50x waterfall as agreed." Defendant never made the additional payment he promised within thirty days or ever, yet continued to receive equity disproportionate to his actual investment – ultimately obtaining 4% equity in BCCG while Plaintiff received only 2%, despite Plaintiff investing substantially more capital.

c) Defendant represented that he had actual knowledge, authority, and involvement with BCCG's operations and financial condition. Defendant made statements such as "I feel good about [the BCCG investment]" (March 22, 2022), "I feel like we are going to make lotsa money together and have even more fun doing it" (March 25, 2022), "I think we are going to hit it out of the park. As crazy as it may sound" (June 10, 2022), "We are in this together! And we will prevail" (August 18, 2022), and "This could be the biggest multiple return on any investment we have done in our lives" (October 17, 2022). In reality, Defendant had no officer or director position with BCCG, conducted no independent due diligence, possessed no material information about the company's operations or financial condition, and later refused to request basic financial documentation from BCCG, stating on September 26, 2022: "We can't ask for bank statements of a company. I would never divulge that."

d) Defendant represented that BCCG was a credible, professionally vetted investment opportunity with strong prospects for returns. These representations were false. Defendant had no basis for assessing BCCG's viability and made such statements solely to induce Plaintiff's investments.

e) Defendant represented that Plaintiff would receive documented ownership rights, regular financial reporting, and returns consistent with Defendant's representations. Defendant never provided these materials, and Plaintiff received no returns whatsoever on his investments.

f) Defendant concealed that he received undisclosed transaction-based compensation – including bonus equity, cash payments, and other benefits – for every dollar that Plaintiff invested in BCCG. This gave Defendant a direct financial incentive to maximize Plaintiff's contributions regardless of BCCG's actual viability or Plaintiff's interests.

125. Each of these representations was false when made. Defendant's intent to defraud is demonstrated by: (a) his systematic fabrication of investment amounts, representing he invested "over $3m" when he actually invested only $903,000.00; (b) his taking credit for Plaintiff's $403,500.00 contribution to inflate his claimed stake; (c) his concealment of his compensation

arrangements and conflicts of interest; (d) his failure to conduct or disclose the absence of due diligence; (e) his refusal to obtain basic financial information about the company he was promoting; and (f) his continued false assurances even after Plaintiff raised concerns, including as late as May 30, 2024, when Defendant stated "Let's wait it out a bit. We have time."

126.    Plaintiff reasonably and foreseeably relied on Defendant's false representations in deciding to enter into the investment contract and in investing a total of $1,631,600.00 in BCCG through three separate investments: $403,500.00 on March 24, 2022; $602,600.00 on June 30, 2022; and $625,500.00 on August 22, 2022.

127.    Plaintiff's reliance was reasonable given the totality of circumstances, including: (a) Defendant's cultivated reputation as a sophisticated global investor and former adviser to Sheikh Mansour bin Zayed Al Nahyan of Abu Dhabi; (b) Defendant's public associations with high-level financial transactions and sovereign wealth entities; (c) Defendant's displays of substantial wealth, including his $50 million residence in Dorado Beach where he hosted Plaintiff; (d) Defendant's specific and detailed representations about his personal financial commitment to BCCG; (e) the purported alignment of financial interests between Plaintiff and Defendant, with Defendant repeatedly stating "we are in this together;" and (f) the relationship of trust that had developed between Plaintiff and Defendant since they first met in 2018.

128.    Had Plaintiff known the truth – that Defendant had grossly exaggerated his own investments, taken credit for Plaintiff's funds, concealed his kickback arrangements and compensation structure, lacked any genuine knowledge of BCCG, conducted no due diligence, and was motivated solely by undisclosed personal profit – Plaintiff would not have entered into the investment contract or made any investment in BCCG. But for Defendant's representations concerning the investment opportunity, Plaintiff would not have invested in BCCG. Plaintiff's

27

consent to the investment contract was vitiated by Defendant's false representations and insidious machinations.

129.   As a direct and proximate result of Plaintiff's justifiable reliance on Defendant's fraudulent representations in the formation of the contract, Plaintiff suffered substantial injury. Plaintiff invested $1,631,600.00 in BCCG based on the false belief that Defendant had aligned financial interests, possessed genuine knowledge of the investment opportunity, and had personally committed substantial capital. BCCG has collapsed, rendering Plaintiff's investments worthless, while Defendant enriched himself through the undisclosed compensation he received for inducing Plaintiff's investments.

130.   By reason of Defendant's *dolo* in the formation of the investment contract, Plaintiff is entitled to nullification of the contract and restitution of all amounts invested.

<u>**COUNT VI**</u>
<u>**DECLARATORY RELIEF UNDER SECTION 29(b) OF THE EXCHANGE ACT**</u>

131.   Plaintiff reaffirms, realleges, and reincorporates paragraphs 1 through 130 as if fully set forth herein.

132.   Plaintiff invested significant sums of money based on an agreement with Defendant, who represented that he had authority, knowledge, and financial sophistication with respect to the company in which Plaintiff invested.

133.   Defendant is not, and has never been, a registered broker-dealer, investment adviser, or licensed investment professional under federal law, including the Securities Exchange Act of 1934, 15 U.S.C. § 78o(a).

134.   Defendant solicited Plaintiff's investment and engaged in conduct that would require registration under Section 15(a)(1) of the Exchange Act, including:

   i.   Offering or selling securities;

28

ii.    Providing advice or recommendations regarding the purchase of securities; and

iii.    Receiving transaction-based compensation from Plaintiff's investment.

135.    Defendant's solicitation and acceptance of investments without proper registration constitutes a violation of Section 15(a)(1) of the Exchange Act.

136.    Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b), authorizes a court to declare any contract void or unenforceable if it was entered into in violation of the registration requirements of the Act.

137.    As a direct and proximate result of Defendant's violations, the investment contract entered into between Plaintiff and Defendant was induced by unlawful acts and is therefore voidable under Section 29(b).

### COUNT VII
### BREACH OF CONTRACT
### (In the Alternative)

138.    Plaintiff reaffirms, realleges, and reincorporates paragraphs 1 through 137 as if fully set forth herein.

139.    Plaintiff and Defendant entered into an agreement, either express or implied, under which Plaintiff would invest funds based on Defendant's representations regarding his financial commitments, expertise, and role in the company.

140.    Defendant represented that he had made substantial personal investments and had authority or control over the relevant company, thereby inducing Plaintiff to invest millions of dollars.

141.    Plaintiff fully performed all obligations under the agreement by providing the agreed-upon investment funds.

142.    Defendant breached the agreement by:

i.   Failing to invest the sums he represented;

ii.  Misrepresenting his role and authority within BCCG;

iii. Concealing material facts about the investment and company; and

iv.  Retaining undisclosed compensation for himself rather than applying Plaintiff's funds as promised.

143.    As a direct and proximate result of Defendant's breach, Plaintiff suffered significant financial losses, in an amount to be determined at trial.

**COUNT VIII**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(In the Alternative)**

144.    Plaintiff reaffirms, realleges, and reincorporates paragraphs 1 through 143 as if fully set forth herein.

145.    Under Puerto Rico law, every contract contains an implied covenant of good faith and fair dealing, which obligates the parties to act honestly and fairly in performing their contractual obligations.

146.    Defendant, by misrepresenting his role, inflating or fabricating his investments, and concealing material facts, acted in bad faith and in contravention of the implied covenant.

147.    Defendant's actions deprived Plaintiff of the benefits of the agreement, including:

i.   Accurate information regarding the investment;

ii.  Proper application of funds according to Defendant's representations; and

iii. A reasonable expectation of profit based on the purported expertise and authority of Defendant.

148.    As a direct and proximate result of Defendant's breach of the covenant of good faith and fair dealing, Plaintiff suffered substantial financial harm.

## COUNT IX
## UNJUST ENRICHMENT
## (In the Alternative)

149.  Plaintiff reaffirms, realleges, and reincorporates paragraphs 1 through 148 as if fully set forth herein.

150.  Plaintiff conferred a benefit on Defendant in the form of investment funds provided in reliance on Defendant's misrepresentations regarding his capital contributions, expertise, and authority over the company.

151.  Defendant knowingly accepted and retained this benefit in the form of investment funds.

152.  It would be inequitable for Defendant to retain the benefit without compensating Plaintiff, given that:

> i.   Defendant misrepresented his investments and authority;
>
> ii.  Defendant concealed material facts; and
>
> iii. Defendant profited personally from Plaintiff's investments through undisclosed compensation.

153.  As a direct and proximate result, Plaintiff has suffered financial losses and is entitled to restitution of the amounts unjustly received by Defendant.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendant as follows:

1.  Declaring the oral investment contract between Plaintiff and Defendant void and unenforceable pursuant to Section 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. §

78cc(b), based on Defendant's violation of the broker-dealer registration requirements under Section 15(a)(1);

2.    Awarding Plaintiff compensatory damages in the amount of $1,631,600.00, representing the full value of Plaintiff's investments procured through Defendant's violations of federal and Puerto Rico securities laws, together with all consequential damages and economic losses proximately caused by Defendant's unlawful conduct;

3.    Alternatively, awarding Plaintiff damages for breach of contract and breach of the implied covenant of good faith and fair dealing;

4.    Alternatively, awarding Plaintiff damages for fraud in the inducement based on Defendant's material misrepresentations and omissions that induced Plaintiff to invest in BCCG;

5.    Alternatively, awarding Plaintiff restitution under principles of unjust enrichment for all amounts wrongfully obtained and retained by Defendant;

6.    Awarding Plaintiff pre-judgment interest from the date of each investment and post-judgment interest from the date of judgment until satisfaction, both at the maximum rates permitted by law;

7.    Awarding Plaintiff reasonable attorneys' fees under 10 L.P.R.A. §§ 890 and 4106, together with all costs of suit and litigation expenses; and

8.    Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL REQUEST

Pursuant to the Seventh Amendment to the United States Constitution, Plaintiff respectfully requests a jury trial on all issues so triable.

Dated: January 5, 2026

Respectfully submitted,

**SEPULVADO, MALDONADO & COURET**
AON Center, Suite 990
304 Ponce de León Avenue
San Juan, Puerto Rico 00918
Tel.: (787) 765-5656
Fax: (787) 294-0073
lsepulvado@smclawpr.com
gcruz@smclawpr.com

By: */s/ Gerardo José Cruz Ortiz*
    **Gerardo José Cruz Ortiz**
    USDC-PR No. 307011
    **Lee R. Sepulvado Ramos**
    USDC-PR No. 211912

**SHAW LEWENZ**
110 SE 6th Street, Suite 2900
Fort Lauderdale, FL 33301
Telephone: (954)361-3633
Facsimile: (954) 989-7781
Primary: jshaw@shawlewenz.com;
zludens@shawlewenz.com;
lpalen@shawlewenz.com
Secondary:mlomastro@shawlewenz.com;
lgrealy@shawlewenz.com

By: */s/ Jordan A. Shaw*
    JORDAN A. SHAW, ESQ.
    Fla. Bar No. 111771
    (*pro hac vice* forthcoming)
    ZACHARY D. LUDENS
    Florida Bar. No. 111620
    (*pro hac vice* forthcoming)
    LAUREN N. PALEN, ESQ.
    Fla. Bar No. 1038877
    (*pro hac vice* forthcoming)
    LAUREN N. ALVAREZ
    Fla. Bar No. 1027723
    (*pro hac vice* forthcoming)

   and

33

**LAW OFFICES OF AARON RESNICK, P.A.**
100 Biscayne Boulevard, Suite 1607
Miami, Florida 33132
Telephone (305) 672-7495
Facsimile (305) 672-7496
**Primary E-mail:** aresnick@thefirmmiami.com
**Secondary E-mail:** Efile@thefirmmiami.com

**By:** */s/Aaron Resnick*
   **AARON R. RESNICK, ESQ.**
   **Florida Bar No. 141097**
   (*pro hac vice* forthcoming)